UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CEDRIC YOUNG, | |
| Plaintiff, | 3:10-CV-606 (CSH) |
| v. | |
| WAYNE CHOINSKI, JEFFREY McGILL, TERANCE ROSE, VALERIE LIGHT, SCOTT SALIUS, JASON HARTLEY, and JAMES WILLIAMS, | MARCH 13, 2014 |
| Defendants. | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**HAIGHT, Senior District Judge:**

Plaintiff Cedric Young, currently confined at the Northern Correctional Institution ("NCI") in Somers, Connecticut, commenced this civil rights action *pro se* pursuant to 42 U.S.C. § 1983. He alleges that the defendants, prison officials and personnel, were deliberately indifferent to his medical and mental health needs on September 3, 2008, constituting cruel and unusual punishment in violation of the Eighth Amendment. Defendants have moved for summary judgment. For the reasons that follow, the motion will be granted in part and denied in part.

## I. STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the movant to establish that there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The moving party may satisfy this burden by demonstrating "that there is a lack of evidence to support the

nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*per curiam*)(citation and internal quotations omitted).

"Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir.2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," *Sousa v. Roque*, 578 F.3d 164, 169 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(c)(2)).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based upon it.  *Liberty Lobby*, 477 U.S. at 248. "[U]nsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citations omitted), *cert. denied*, 540 U.S. 811 (2003).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the non-moving party must present sufficient evident to show that a fact-finder could reasonably find genuine issues of fact.  Furthermore, the nonmoving party "cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (citations and internal quotations omitted).  The "mere of existence of a scintilla of evidence in support of the [nonmoving party's] position is insufficient; there must be evidence on which the jury could reasonably find for [him]." *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (quoting *Liberty Lobby*, 477 U.S. at 252).  *See also BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (to defeat summary judgment, "conclusory allegations" will not suffice).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. *Donnelly v. Greenburgh Cent. School Dist. No. 7,* 691 F.3d 134, 141 (2d Cir. 2012). Summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus, if there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where one party is proceeding *pro se*, the court reads the *pro se* litigant's papers liberally and interprets them to raise the strongest arguments suggested therein. *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). *See also Dorlette v. Butkiewicus*, No. 11–cv–1461 (TLM), 2013 WL 4760943, at *5 (D.Conn. Sept. 4, 2013) ("It is well-settled that pro se submissions are held to less stringent standards than formal pleadings drafted by lawyers[,] particularly when allegations concern civil rights violations.") (citation and internal quotations omitted). Despite this liberal interpretation, an unsupported or "bald" assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) (citing *Liberty Lobby*, 477 U.S. at 251-52).

## II.  <u>FACTS</u>

The facts considered by the Court are those relevant, admissible facts, supported by documentary evidence and sworn affidavits, which are referenced in the defendants' Local  Rule

56(a)1 Statement.[1]  *See* Docs. Nos. 45-1, 45-3 through 45-16.

At the outset, the Court notes that  Local Rule 56(a)2 of this Court requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs, corresponding to the movant's Local Rule 56(a)1 Statement, and indicates whether the opposing party admits or denies the facts set forth by the movant.  D. Conn. L. Civ. R. 56(a)2.   Each admission or denial must include a citation to an affidavit or other admissible evidence. *Id.*  In addition, the opposing party must submit a list of disputed factual issues. *Id.* 56(a)2 & 56(a)3.   Plaintiff has filed no opposition papers to the pending summary judgment motion.

Contemporaneously with  their motion for summary judgment, defendants filed the requisite "Notice to Pro Se Litigant" [Doc. No. 44], informing Young of his obligation to respond to the motion, the time limit for filing his response, and the contents of a proper response. *See* D. Conn. L. Civ. R. 12.  Furthermore, the Court issued Young two orders and notices to inform him that he must file opposition papers to defendants' motion for summary judgment or the material facts set forth in that motion, if supported by evidence, would be deemed admitted.  *See* Doc. 48 & 49.  The deadlines to respond (November 1, 2013, and January 24, 2014, respectively) expired and plaintiff failed to file any objection or response to the summary judgment motion.  Accordingly, defendants' properly supported facts are deemed admitted.  *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to

---

[1] The "principles governing admissibility of evidence  do not change on  a motion for summary judgment." *Porter v. Quarantillo,* 722 F.3d 94, 97 (2d Cir. 2013) (citing and quoting *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997)).  *See also Santos v. Murdock*, 243 F.3d 681,683 (2d Cir. 2001) ("evidence [on summary judgment] may be, and frequently is, presented in the form of affidavits which, when used, shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

be served by the opposing party in accordance with Rule 56(a)2.").  Those facts include the following.

Plaintiff Young was confined at NCI from December 12, 2007 through September 4, 2008.[2] He has a history of mental illness, substance abuse, and post-traumatic stress disorder; and has complained of depression and hearing voices.  Doc. 45-5, p. 2-3;  Doc. 45-6, p. 2, 4, 7, 16.[3] Department of Correction ("DOC") mental health physicians treated Young at NCI with multiple medications.  Doc. 45-7, p. 1-19.  From December 12, 2007 until September 3, 2008, NCI mental health professionals saw him twice a month for private clinical sessions, known as "Face to Face Private Audio Control" sessions.  Doc. 45-6, p. 2-17.  In addition to these sessions, mental health professionals examined and evaluated Young eight times in response to his requests for immediate treatment.  *Id.*

On April 24, 2008, Young used a piece of a broken battery to cut his right arm.[4]  *Id.*, p. 7. The cuts were superficial and medical staff cleaned and bandaged his wounds.  Young informed medical department employees that he cut his arm to reduce his stress and to get attention from

---

[2] The Court has taken judicial notice, as the result of information received in an unrelated case, that plaintiff Cedric Young became incarcerated at the MacDougall-Walker Correctional Institution in Suffield, Connecticut, as of April 2013.  Doc. 49.  He is currently serving a 9 ½ year sentence on that unrelated charge.

[3] All page numbers cited refer to the Court's "Document" page numbers appearing in blue in the top line of each page (and not to the page numbers of the original documents, often at the bottom or top corner of the pages).

[4] There is some discrepancy as to the item Young used to attempt to cut his arm on April 24, 2008.  The DOC "Clinical Record" of that date states that Young used "a piece of broken battery" [Doc. 45-6, p. 7]; but in Young's "inmate grievance," dated May 20, 2008, he asserts that he "attempted to cut [h]is arm with a razor" [Doc.45-8, p. 7].

mental health professionals.  *Id.*, p. 7-9; Doc. 45-10, ¶ 5.  Clinical Social Worker Patrick Ward examined Young later that day, at which time Young stated that he was feeling stress due to a lack of contact with his mother, but denied suicidal and/or homicidal ideation.  Doc. 45-6, p. 7; Doc. 45-10, ¶ 5a. Ward met with the plaintiff again on April 25, 2008.  Doc. 45-10, ¶ 5b. Young again denied suicidal and homicidal ideation, denied audio and visual hallucinations, and stated that he would not cut himself again to relieve stress.  *Id.*

On May 12, 2008, in response to prior grievances filed by Young, Dr. Mark Frayne agreed to try to "tighten up" the times mental health professionals toured inmate units. Doc. 45-8, p. 8.  On May 20, 2008, Young filed another grievance, alleging negligence on the part of mental health staff with respect to the April 24 incident when he "attempted to cut [his] arm with a razor." He requested that he be seen three times per month. *Id.,* p. 7.

On June 18, 2008, Young reported that he was experiencing suicidal thoughts, and correctional staff referred him to the mental health unit.  Doc. 45-6, p. 13. When Young arrived at the mental health unit, he reported that "his issues were resolved because he had just received a letter from his mother." *Id.*, p. 13-14.

On July 29, 2008, Dr. Gerarde Gagne, a psychiatrist at NCI, examined the plaintiff and diagnosed Young as suffering from "borderline  antisocial disorder as [a] result of early trauma." Doc. 45-6, p. 16.  Dr. Gagne prescribed medications for this condition.  *Id.*

On August 30, 2008, Young threatened the prison staff that he "better be back on [his] meds today or else [he was] going to show them."  *Id.*, p. 17.  He complained that the new medications were not working, he was starting to hear voices, and  if not placed back on his prior medications, he would become suicidal.  *Id.*

On September 3, 2008, Young was confined in 1 East Unit, Cell 211.  At 11:45 a.m., Social Worker Ward attempted to conduct a clinical session with Young, but Young refused to see him. Doc. 45-12, p. 2; Doc. 45-10, ¶ 5d.   At 9:15 p.m., Young felt suicidal and pressed the call button in his cell.[5] Doc. 45-3, p. 12.  He  told Officer Jason Hartley, who was working in the control pod in 1 East Unit, that he felt suicidal and needed to speak to someone in the mental health unit.  *Id.* Hartley said "okay" and hung up the phone. *Id.*  By 9:30 p.m., no one from the mental health unit had arrived at Young's cell so he pressed the call button repeatedly, attempting to contact  Hartley in the control pod, but there was no response. *Id.*, p. 13.  Young then began to cut his arms with a piece of a battery casing.  *Id.*, p. 13-14.

At approximately 9:30 p.m., Officer James Williams was on the tier in the housing unit where Young's cell was located.  *Id.*, p. 13.  Williams noticed that the window of the plaintiff's cell door was covered and approached the cell to address the issue with him.  *Id.*, p. 13-14.  Young removed the window covering and Williams observed that Young  was holding a battery casing in one hand.  Plaintiff claimed that his "arms were bleeding."  *Id.*

 Williams testified by affidavit that he "observed [Young] scratch at his arm once," but "did not see what type of object he was using, if any," and "did not see any blood." Doc. 45-13, ¶ 3. Williams called the mental health unit, but received no  response.  *Id.,* ¶ 4.  He attempted to call a second time and was told that the mental health employees had left for the day.  *Id.* At about 10:00

---

[5]     These particular facts regarding defendant Hartley are based upon the deposition testimony of Young, which defendants filed in support of their motion for summary judgment.  Doc. 45-3, p. 12.  The Court recognizes that Hartley denies that Young contacted him on the evening of September 3, 2008, but stipulates that such contact was made for purposes of this motion.  *See* Doc. 45-2, p. 10 n. 1.

p.m., during his tour of Young's housing unit, Williams informed Young that mental health personnel had left for the evening. *Id.*, ¶ 5.  At that time,  Williams observed no injuries on the plaintiff's body and that "he certainly was not doing anything to hurt himself." *Id.*  Williams left and "did not prepare an incident report because," in his view, he "did not perceive there to be a reportable incident." *Id.*, ¶ 6.  Namely, there was no "inmate suicide attempt,"  "serious injury to an inmate requiring emergency medical treatment, dangerous contraband, . . . injury to an inmate requiring non-emergency medical attention, or any other reportable incident." *Id.*

At approximately 10:47 p.m., Correctional Officer Germaine Fleeting conducted a tour of Young's housing unit and approached his cell.  Doc. 45-4, p. 3.  Officer Fleeting observed that Young was upset and heard him demand to call the medical department.  *Id.*  After attempting to "us[e] his inter person[al] communication skills to calm" Young for "several minutes," Fleeting notified his supervisor and [the] medical" department.  *Id.*  The "third shift supervisor and medical staff arrived on [scene] and took over [the] incident." *Id.*   As Correctional staff escorted Young to the medical unit, an officer videotaped Young walking  from his cell to the medical unit and his placement in a cell therein.  Doc. 45-14; Doc. 45-4, p. 6, 14.   In the videotape, Young was wearing a white t-shirt; and there were no signs of blood on the t-shirt or on Young's arms.  Doc. 45-14 (video) at 2:12 to 2:50, 4:21 to 4:40.  In the video, the wounds appear to be superficial scratches. *Id.*, at 2:43 to 2:47; *see also* Doc. 45-4, p. 30 (photos of wounds).

 Shortly after Young's arrival in the medical unit, a lieutenant took photographs of the wounds on both of his forearms.  Doc. 45-4, p. 5.  Nurse Wendy Sanders cleaned the  wounds, applied antibiotic ointment, and gave him medication.  Doc. 45-4, p. 16.  In drafting her medical incident report, Sanders noted "inmate self-inflicting superficial abrasions to bilat[eral] forearms,

inmate using battery casing." *Id*.  She also described  "mulitple superficial abr[asions] to bilate[ral]

forearms" and "[m]inimal bleeding." *Id*.   Corrections officers photographed Young's wounds and

the small piece of metal he used to scratch himself.  Doc. 45-4, p. 30.  In the photos, there was no

discernible blood from  the wounds and no bandages were placed on Young's arms.  *Id*.

A physician, "Dr. Ziadi,"  then  issued an order that Young be admitted to the medical unit

and placed on suicide watch due to his claims that he intended to cause himself harm.  *Id.,* p. 5-6.

After being kept on suicide watch for approximately one day, Doctor Frayne released Young from

the medical unit into the General Population.  *Id.*, p. 19.

### III.  DISCUSSION

Plaintiff Young contends that on the evening of September 3, 2008, he suffered from  serious

medical and mental health needs.   Doc. 37, ¶¶18-19, 22-23.  He alleges that the defendants were

aware of, but deliberately indifferent, to those needs both during and after he cut both of his arms.

*Id*.  Young concludes that, in denying and/or delaying his access to medical and mental health care,

defendants have violated his Eighth Amendment rights, subjecting him to unnecessary and wanton

infliction of pain.  He thus seeks recovery under 42 U.S.C. § 1983.[6]  In plaintiff's words, defendants'

deliberate  indifference "inflamed [his] mental anguish, emotional distress, paranoia, pain and

---

[6]  42 U.S.C. § 1983 states, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes to be
subjected, any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an action at law, suit in
equity, or other proper proceeding for redress, . . . .

suffering, and . . . [resulted in] physical body scars from injures [sic]."  Doc. 37, ¶ 16.

In their pending motion for summary judgment, defendants argue that: (1) Young  has not alleged that he suffered from a serious medical need; (2) Officers Hartley and Williams were not deliberately indifferent to Young's mental health needs; and (3) Warden McGill, Deputy Wardens Light and Rose, Captain Salius, and District Administrator Choinski were not involved in the alleged deliberate indifference to Young's mental health needs.

A.    <u>**Deliberate Indifference to Medical Needs**</u>

Defendants contend that Young has neither  alleged nor provided evidence to demonstrate that he suffered from a serious medical need during the incident that occurred on September 3, 2008. Doc. 45-2, p. 15.  Specifically, they assert that "[s]cratches do not present a serious medical need," *id.*, and thus  conclude that Young has failed to state an Eighth Amendment claim of deliberate indifference to serious medical needs against any of the defendants.

The Supreme Court has held that deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To prevail on such a claim, a plaintiff must provide evidence of sufficiently harmful acts or omissions and intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel.  429 U.S. at 104-06.  "[T]he Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law."  *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).  "[N]ot every lapse in prison medical care will rise to the level of a constitutional violation." *Id.*.  "Mere negligence will not support such a claim under section 1983; there must be

some conduct that 'shocks the conscience' or a 'barbarous act.'" *McCloud v. Delaney*, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864 (2d Cir. 1970)). *See also  Wesolowski v. Kamas*, 409 F. App'x  476, 477 (2d Cir. 2011) ("Deliberate indifference 'entails something more than mere negligence.'") (quoting *Farmer v. Brennan*, 511 U.S.825, 835 (1994)).

In sum, "[t]o succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must satisfy two requirements[:]  [h]e must show both that the danger posed by the indifference he alleges is 'sufficiently serious' and that the defendant has acted with 'deliberate indifference to inmate health or safety' in failing to address this danger." *Smith v. Fischer*, 500 F.App'x 59, 61 (2d Cir. 2012) (citing *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)).

There are thus  both subjective and objective components to the "deliberate indifference" standard. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom., Foote v. Hathaway*, 513 U.S. 1154 (1995).  Objectively, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Such a "condition of urgency . . . may produce death, degeneration or extreme pain." *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citing *Hathaway*, 37 F.3d at 66).  Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions. *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).  "More specifically, a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hathaway*, 37 F.3d at 66 (quoting *Farmer*, 511 U.S. at 837). The fact that a prison official did not

11

alleviate a significant risk that he *should have but did not perceive* does not constitute deliberate indifference. *Farmer*, 511 U.S. at 838 (emphasis added).

The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition. Such factors "include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" *Salahuddin v. Goord*, 467 F.3d 263,  280 (2d Cir.2006)(quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998)).  In addition, where the denial of treatment "result[s] in  further significant injury or the unnecessary and wanton infliction of pain," the medical need is considered "serious.*" See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance*, 143 F.3d at 702)).  *See also Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) ("A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

The second prong of "deliberate indifference" requires the prisoner "to prove that the prison official knew of and disregarded the [prisoner's] serious medical needs." *Chance*, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at  104. *Wesolowski*, 409 F. App'x at 477 ("A prison official acts with deliberate indifference when he *'knows of and disregards* an excessive risk to inmate health or safety.'") (emphasis added) (quoting *Farmer*, 511 U.S. at 837); *see also Lewis v. Cunningham*, 483 F. App'x 617, 619 (2d. Cir. 2012) (same).  A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference.  *Chance*, 143 F.3d at 703.  "Nor does the fact

that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical

attention he preferred." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311

(S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986)).  "In the context of

allegations of inadequate medical care under the Eighth Amendment, [the Second Circuit has] held

that '[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different

treatment does not give rise to an Eighth Amendment violation.'") (quoting  *Chance*, 143 F.3d at

703).  *See also Sonds*, 151 F.Supp. 2d at 311 ("As long as the medical care is adequate, there is no

Eighth Amendment violation.").[7]

The defendants characterize Young's medical needs on September 3, 2008 as scratches or

superficial abrasions on his arms.  They argue that these wounds do not constitute a serious medical

need.  Doc. 45-2, p. 15-16.

In contrast, Young alleges that he cut his arms with a metal object causing him to "bleed

severely." Doc. 37 (Amended Complaint), p. 7 ( ¶ 13).  The video recording of Young's self-inflicted

wounds reflects multiple abrasions to his arms.  However, none of the  wounds appear to be bleeding

at the time he was escorted from his cell to the medical unit. Doc. 45-14 (video) at 2:12 to 2:50, 4:21

to 4:40.  Nurse Sanders, who treated Young at that time, filed a medical incident report describing

the wounds as abrasions with "minimal bleeding." Doc. 45-4, p. 16.   She examined the wounds,

cleaned them, and applied antibiotic ointment.  *Id.*

Young has not alleged that these abrasions on his arms significantly interfered with his daily

---

[7]    Furthermore, "[t]he bare allegation that the treatments have so far been unsuccessful is
insufficient to state a claim for deliberate indifference." *Bryant v. Wright*, 451 F. App'x 12, 14 (2d
Cir. 2011).

activities or caused him substantial or chronic pain.   Furthermore, he has offered no evidence that these wounds required any further treatment.   The Court has examined all of the evidence, including the  photographs presented of the abrasions [Doc. 45-4, p. 30], and concludes that Young has failed to meet his burden of demonstrating that his self-inflicted wounds constituted a "serious medical need."  *See, e.g., Ruffino v. Gomez*, No. 3:05-CV-1209 (JCH), 2006 WL 3248570, at *7-8 (D. Conn. Nov. 8, 2006 ) (bruises, scrapes and scratches treated with antibiotic ointment did not rise to the level of a "serious medical need").  *See also  Davis v. Jones*, 936 F.2d 971, 972-73 (7th Cir. 1991) (a scraped elbow and a one-inch cut to an arrestee's temple, neither deep enough nor long enough to require stitches, were not sufficiently "serious" to require prompt medical attention under the Eighth Amendment), *reh'g denied*, 946 F.2d 538 (7th Cir. 1991); *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990) (injured detainee who was "bruised but unbroken, requiring mo more medical care than a sling, an eye-patch and the application of some disinfectant" for abrasions did not have a "serious medical need"), *cert. denied*, 500 U.S. 956 (1991); *Wesson v. Oglesby,* 910 F.2d 278, 284 (5th Cir.1990)(inmate's swollen, bleeding wrists from handcuffs that were too tight do not constitute a serious medical need);  *Ford v. Phillips*, No. 05 Civ. 6646 (NRB), 2007 WL 946703, at * 12 (S.D.N.Y. Mar. 27, 2007) ("[a]brasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain," and were thus not sufficiently serious).  *See also Chatin v. Artuz*, 28 F. App'x 9, 10-11 (2d Cir. 2001) ("Chatin's condition, which medical staff at various stages of his treatment diagnosed as a sprained ankle, a bone spur, and a neuroma, did not rise to the level of seriousness that the Eighth Amendment requires.").

Accordingly, because Young has failed to establish that his medical need was objectively "serious" – and has not attempted to meet his burden in opposition to summary judgment –

defendant's motion for summary judgment [Doc. 45] will be granted as to the claims of deliberate indifference to a serious medical need against all defendants.

**B.    Deliberate Indifference to Mental Health Needs**

Young alleges that both Officers Hartley and Williams were deliberately indifferent to his serious mental health needs.  Doc. 37, p. 4-9 (¶¶ 8-16).  "As there is 'no sound underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart,' *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir.1977), the 'deliberate indifference' standard of *Estelle* [*v. Gamble*] is equally applicable to the constitutional adequacy of psychological or psychiatric care provided at a prison."  *Guglielmoni v. Alexander,* 583 F.Supp. 821, 826 (D.Conn. 1984) (citing *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir.1979)) .  *See also Atkins v. County of Orange*, 372 F.Supp.2d 377, 408 (S.D.N.Y. 2005) ("In the Second Circuit, it is equally clear that psychiatric or mental health care 'is an integral part of medical care' and falls under the rule laid out in *Estelle* which requires that such care be provided to prisoners.") (quoting *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.1989))*; Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977) (for purposes of considering an Eighth Amendment violation under *Estelle*, there is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart").  Thus, deliberate indifference by prison officials to an inmate's serious mental health needs constitutes cruel and unusual punishment in violation of the Eighth Amendment.

Defendants Hartley and Williams do not contest the fact that Young suffered from a serious mental health need on September 3, 2008. Moreover, case law within this Circuit recognizes that "depression combined with severe anxiety attacks or suicide attempts is a serious medical need" in

the context of deliberate indifference.  *See Zimmerman v. Burge*, No. 9:06–cv–0176 (GLS/GHL), 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (collecting cases); *Guglielmoni*, 583 F.Supp. at 826 ("Treatment of mental disorders of mentally disturbed inmates is . . . a 'serious medical need' under *Estelle*.").

Evidence presented suggests that prior to September 3, 2008, psychiatrists had diagnosed Young as suffering from post-traumatic stress disorder, borderline personality disorder and anti-social personality disorder. Doc. 45-6.   They prescribed medication for Young in an effort  to treat these conditions.  *See, e.g., id.*, p. 16-17.   In addition, Young's medical and mental health records reflect that he had made prior attempts and threats to commit suicide.  Doc. 45-8, p. 7.

1.     <u>Officer Hartley</u>

Defendant Hartley argues that even though Young suffered from a serious mental health need, Hartley was not deliberately indifferent to that need.   Young declares, and Officer Hartley concedes for purposes of deciding this motion, that on September 3, 2008, at approximately 9:15 p.m., Young informed Hartley that he was feeling suicidal and needed to speak to personnel in the mental health unit.[8]  Although Young has not submitted an affidavit to support his claims and oppose defendants' summary judgment motion, the contents of his Amended Complaint [Doc. 37] are sworn to under the penalty of perjury and thus constitute the equivalent of an affidavit for purposes of defendants' summary judgment motion.  *See Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir.1988) (accepting sworn complaint as evidence of factual dispute for summary judgment and citing *Pfeil*

---

[8] *See* Doc. 45-2, p. 10 n. 1 (Although Hartley "maintains the plaintiff never contacted him during the evening of September 3, 2008, . . . [t]he defendants stipulate to the plaintiff's version of the facts for purposes of this motion only.").

*v. Rogers*, 757 F.2d 850, 859 & n. 15 (7th Cir.1985) ("noting that documents sworn under penalty of perjury may suffice for summary judgment purposes even if they do not meet all of the formal requirements of a notarized affidavit"), *cert. denied*, 475 U.S. 1107 (1986)).   Furthermore, defendants have submitted Young's deposition testimony in support of their motion for summary judgment.  That testimony supports Young's allegations in his complaint, suggesting that Hartley acknowledged his need to "speak to mental health" at the prison.  Doc. 45-3, p. 12.

In contrast, no evidence demonstrates whether Hartley knew about any prior threat or attempts to commit suicide by Young.  Without such information, there remains an issue of fact as to whether Young's comments to Hartley regarding his suicidal feelings on September 3, 2008, put Hartley on actual notice of a serious risk of suicide.

Furthermore, Hartley has failed to present evidence to the Court that he took any actions on September 3, 2008 to obtain mental health assistance for Young.   Rather, he avers that it is his "belief that Inmate Young did not call the control pod during the evening of September 3, 2008 for mental health assistance in dealing with feelings of suicide." Doc. 45-15, ¶ 5.  Hartley reaches this conclusion based on the fact that he "did not make any entry concerning Inmate Cedric Young on September 3, 2008 in the 1 East Unit Control Pod Officer Log Book," except to note the arrival of a lieutenant and nurse in the unit "to address Inmate Young's issues" at 10:45 p.m.  *Id.*

Young, on the other hand, has declared that Hartley took no action in response to Young's initial statement that he was feeling suicidal or to his further attempts to contact Hartley fifteen minutes later.  Doc. 37, p. 5 (¶¶ 9-10).  Young's deposition testimony supports his allegations. Doc. 45-3, p. 12-13.

The Court thus concludes that there is a genuine issue of material fact as to whether Hartley

17

intentionally refused to take action to summon mental health or medical personnel to evaluate and treat Young after Hartley became aware of Young's suicidal thoughts.  Accordingly, the motion for summary judgment will be denied as to the claim that Officer Hartley was deliberately indifferent to Young's mental health needs.

### 2.    __Officer Williams__

Plaintiff Young alleges that Officer Williams was also deliberately indifferent to his mental health needs.  Young declares that at approximately 9:30 p.m., he told Williams that he was going to kill himself and showed him the piece of metal that he was using to cut his arms.  Doc. 37, p. 6 (¶ 11); Doc. 45-3, p. 13-16.   Williams concedes that Young asked him to call the mental health unit and that he observed Young "scratch at his arm once," but "did not see any blood." Doc. 45-13, ¶ 3. Williams testified by affidavit that he used his hand-held radio to try to call the mental health unit, but "did not receive a response."  *Id.*, ¶ 4.   Williams states that thereafter he attempted to call the mental health unit a second time and "was told  the Mental Health Unit had left for the evening at 9:30 pm."  *Id.*  Williams informed Young of this fact during his 10:00 p.m. facility tour count.  *Id.*, ¶ 5.  Williams provides no evidence indicating that he took any further action that evening with respect to Young's requests for mental health treatment.

Young alleges that at approximately 10:45 p.m., he spoke to another correctional officer, Officer Fleeting, and asked him to call for medical treatment. Doc. 37, p. 8 (¶ 15); Doc. 45-4, p. 3. Fleeting contacted his supervisor and the medical department; and the supervisor and a nurse then arrived at Young's cell and "took over [the] incident. Doc. 45-4, p. 3.  Both the supervisor and nurse noted that Young had made self-inflicted wounds to his arms and was expressing thoughts of

harming himself. *Id.*, p. 6, 16-17.   A decision was made by "on-call doctor Ziadi" to place Young "on Mental Health Observation" in the medical unit. *Id.*, p. 23.

Although defendants have asserted that Williams was not deliberately indifferent to "a sufficiently serious medical need," Doc. 45-2, p. 14-16, focusing on the abrasions on Young's arms, they have not addressed the issue of whether he was deliberately indifferent to Young's serious *mental health* needs.   In light of the absence of evidence as to whether Williams took additional actions after 10:00 p.m. to obtain mental health assistance for Young on September 3, 2008, that claim will remain pending.

## C.   <u>Supervisory Liability – Personal Involvement</u>

Plaintiff Young alleges that he sent written requests, grievances and grievance appeals to defendants Warden McGill, Deputy Wardens Light and Rose, Captain Salius and District Administrator Choinski.   In particular, Young alleges that these defendants "should have known that the plaintiff was denied mental health and medical treatment immediately after its occurance [sic] because of verbal, written reports, and camera footage." Doc. 37, p. 10 (¶ 18).   Moreover, plaintiff asserts that said "supervisory officials . . . have actually condoned the actions by the defendant officers [Hartley and Williams]" in that "they failed and deliberately refused to correct the wrong[s] and take any appropriate action at all to throughly [sic] investigate this serious matter and discipline" said officers. *Id.*, p. 10 (¶ 19).

The supervisory defendants counter, stating that even if one "[a]ccept[s] as true the plaintiff's contentions that the . . . supervisory officials denied his grievances and failed to respond to his request for investigations, this evidence alone is insufficient to constitute the basis for supervisory

liability." Doc. 45-2, p.16.   These defendants maintain that they cannot be held liable in their individual capacities because there is no suggestion or evidence that they had "personal involvement" with respect to deliberate indifference to plaintiff's mental health needs. *Id.*, p. 17.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (internal quotation marks omitted), as there is "no respondeat superior liability in § 1983 cases," *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir.1995). Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[9] *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). *See* also *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("An official cannot be liable merely because he or she occupies a high position in the prison hierarchy.").   In addition, a plaintiff must demonstrate an affirmative causal link between the supervisory official's inaction and the plaintiff's injury.  *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

Prior to the Supreme Court's decision in *Iqbal*, the Second Circuit articulated in *Colon* that a plaintiff had  five ways to establish a supervisor's personal involvement:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference

---

[9]   In *Ashcroft v. Iqbal*, the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," and held each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  556 U.S. at 677.

> to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873 (citations omitted).

Following *Iqbal,* the Second Circuit has not squarely addressed the impact of *Iqbal*, if any, on the *Colon* factors. Consequently, a split has arisen among the District Courts in the Circuit regarding whether the five *Colon* factors continue to apply. *See Reynolds v. Barrett*, 685 F.3d 193, 205 n. 14 (2d Cir. 2012) (noting that "*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995);" but concluding "the fate of *Colon* is not properly before us"). *See also Martinez v. Perilli*, No. 09 Civ. 6470(WHP), 2012 WL 75249, at *4 (S.D.N.Y. Jan. 5, 2012) (holding "five *Colon* categories still apply after *Iqbal*" and gathering cases); *Delgado v. Bezio,* No. 09 Civ. 6899(LTS), 2011 WL 1842294 at *9 (S.D.N.Y. May 9, 2011) ("where the claim does not require a showing of discriminatory intent, the *Colon* analysis should still apply, insofar as it is consistent with the particular constitutional provision alleged to have been violated.'") (internal citations and quotations omitted); *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801(SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("[o]nly the first and part of the third Colon categories pass *Iqbal*'s muster"); *Vann v. Fischer,* No. 11 CIV.1958 JPO, 2012 WL 2384428, at *5 n.9 (S.D.N.Y. June 21, 2012) ("These are only the first and third scenarios listed in *Colon* in which personal involvement might be found, but the others have been invalidated by the Supreme Court's holding in *Iqbal* that a supervisor's mere knowledge of his subordinate's discriminatory purpose [does not] amount [ ] to the supervisor's violating the Constitution.") (citation and internal quotations omitted); *Bryant v. County of Monroe*, No. 09–CV–6415–CJS, 2010 WL 4877799, at *3 (W.D.N.Y.

Nov. 22, 2010) ("The Court . . . is persuaded by the analysis of . . . *Iqbal* . . . in *Bellamy* . . . . ").

Cases in this District have repeatedly acknowledged this split over *Iqbal* in addressing the *Colon* factors, but have abstained from determining "whether *Iqbal* applies in all cases or just those involving discriminatory intent." *Ziemba v. Lajoie*, No. 3:11CV845 (SRU), 2012 WL 4372245, at *3 (D.Conn. Sept. 24, 2012).  *See also  Dupas v. Arnone,* No. 3:12–cv–1215 (AVC), 2012 WL 4857565, at *3 (D.Conn. Oct. 10, 2012) (same); *Grenier v. City of West Haven*, No. 3:11cv808 (JBA), 2012 WL 4092587, at * 5 (D.Conn. Sept. 17, 2012) ("The Second Circuit has not yet addressed claims of supervisory liability in the wake of *Iqbal*."); *Dorlette v. Butkiewicus*, No. 11–cv–1461 (TLM), 2013 WL 4760943, at *5 n.5  (D.Conn. Sept. 4, 2013) ("As the Second Circuit recently observed, the United States Supreme Court's 2009 decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) 'engendered conflict within [the] Circuit about the continuing vitality of the supervisory liability test set forth in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).'") (quoting  *Reynolds,* 685 F.3d at 205 n. 14).

Although the Second Circuit has not addressed the issue  directly, it has suggested that at least some of the *Colon* factors remain viable. *See Rolon v. Ward*, 345 F. App'x 608, 611 (2d Cir. 2009) ("A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others."). *See also Scott v. Fischer*, 616 F.3d 100, 108–09 (2d Cir.2010) ("we recognize that a supervisory official may be liable under section 1983 not only because he or she created a policy or custom under which unconstitutional practices occurred, but also because he or she allowed such a policy or custom to continue") (citation, internal quotations, and brackets omitted).  Furthermore, "there is no

controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor." *Aguilar v. Immigration and Customs Enforcement Div.*, 811 F.Supp.2d 803, 815 (S.D.N.Y. 2011).

Although *Iqbal* does arguably cast doubt on the viability of certain categories of supervisory liability, where the Second Circuit has not revisited the criteria for supervisory liability, this Court will continue to recognize and apply the *Colon* factors.[10] The Court will thus examine plaintiff's allegations and all properly presented, relevant and admissible, evidence with respect to the supervisory defendants.

### 1.   Defendants Salius, Light and Rose

Young alleges that he sent written requests to defendants Salius, Light, and Rose regarding the failure of Officers Hartley and Williams to respond to his requests for mental health treatment. Doc. 37, p. 10 (¶ 18) (alleging "written reports" to, *inter alia*, Light, Rose and Salius). Also, attached to Young's original Complaint are copies of the "Inmate Request Forms" that he sent to Captain Salius and Deputy Warden Rose.   Doc. 1., Ex. A & B ("Inmate Request Forms")

The fact that a prisoner sent a letter or written request to a supervisory official does not establish the requisite personal involvement of the supervisory official.  *See Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim.") (quoting *Candelaria v. Higley*, No. 04-CV-277, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) (gathering

---

[10]    *DeJesus v. Albright*, No. 08 Civ. 5804 (DLC), 2011 WL 814838, at *6 n. 4 (S.D.N.Y. Mar. 9, 2011)

cases)).  Furthermore, the law is well established that "inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddell*, 582 F.Supp.2d 437, 445-46 (W.D.N.Y. 2008) (citing cases). Thus, a supervisory official's mere receipt of a letter complaining about unconstitutional conduct is not enough to give rise to personal involvement on the part of the official.  *See, e.g., Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (prison official who received inmate's letter but forwarded it to subordinate for investigation and response was not personally involved in depriving inmate of constitutional right); *Jones v. Fischer,* No. 9:11–cv–774 (GLS/CFH), 2013 WL 4039377, at *10 (N.D.N.Y. Aug. 7, 2013) ("receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement");  *Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006) (failure of supervisory prison official to take action in response to letters complaining of unconstitutional conduct is insufficient to demonstrate personal involvement).

Young alleges that after the incident involving his attempted suicide on September 3, 2008, he sent Inmate Request Forms to Deputy Wardens Light and Rose and Captain Salius asking them to investigate, review or preserve any videotape of the conduct of Officers Hartley and Williams. *See* Doc. 37, p. 10 (¶ 18), Doc. 1, Ex. A & B.[11]  The fact that these defendants failed to respond to

---

[11]  The Court has examined the exhibits attached to  Young's original  complaint [Doc. 1] because defendants have cited to them as evidence in support of their summary judgment motion. *See* Doc.45-2, p. 16; Doc. 45-1, p. 6.  Moreover, plaintiff requested that these exhibits be incorporated into his amended complaint, intending them to remain part of the court record. Doc.17.

the Inmate Request Forms is insufficient to demonstrate the requisite "personal involvement" to maintain his claims of deliberate indifference to his mental health needs.  Furthermore, as in *Jones, supra*, there is no indication that any of these defendants "created a policy or custom under which unconstitutional practices occurred, were grossly negligent in their supervision of subordinates, or exhibited deliberate indifference to [plaintiff's] rights." 2013 WL 4039377, at *10.  Accordingly, defendant's summary judgment motion will be granted as to the claims of deliberate indifference to mental health needs against defendants Salius, Light and Rose in their individual capacities.

### 2.    **Defendant Choinski**

Young also asserts that he filed grievances regarding the failure of Officers Hartley and Williams to provide him with mental health treatment and that Warden McGill denied those grievances.  *See* Doc. 37, p. 11 (¶ 20); Doc. 1, Ex. D & D-1.   Young claims that he sent Level Two Appeals of the denials to District Administrator Choinski, but Choinski failed to respond.  Young further asserts that when the time to respond to his Level Two Appeals had expired, he filed Level Three Appeals of the denials of his grievances, which were also denied. Doc. 37, p. 11 (¶ 20). Attached to the plaintiff's complaint are the rejections of the Level Three Appeals by an Administrative Remedies Coordinator on the ground that there was no evidence that Young had filed Level Two Appeals of the denials of the grievances.   *See* Doc. 1, Ex. D ("You never filed level 2. You can not [sic] file a level 3 prior to level 2."); Ex. D-1 (same).  Also attached to the original Complaint [Doc. 1] is an Inmate Request Form that Young allegedly sent to District Administrator Choinski on January 22, 2009, asking him to "look into this matter [of the missing level 2 appeals] and give [him] a disposition for [his] level 2 appeals." Doc. 1, Ex. F.  Young alleges that District

Administrator Choinski did not respond to that Inmate Request Form.   Doc. 37, p. 10 (¶ 19).

Young has offered no evidence to demonstrate that Choinski actually received the appeals of the denials of his September 2008 grievances or the Inmate Request Form regarding the alleged missing appeals, Doc. 1, Ex. F.   Moreover, the fact that Choinski may have failed to respond to or process the appeal of the denial of plaintiff's grievances regarding the conduct of Officers Hartley and Williams and/or may have failed to respond to plaintiff's request to investigate the missing level 2 appeals does not demonstrate Choinski's "personal involvement" in the deliberate indifference to Young's mental health needs.  *See Jones,* 2013 WL 4039377, at *10; *Sealey*, 116 F.3d at 51; and *Smart*, 441 F. Supp. 2d at 642-643.   Summary judgment will be granted as to plaintiff's claims of deliberate indifference to mental health needs against defendant Choinski in his individual capacity.

### 3.    **Defendant McGill**

Plaintiff  alleges that after September 3, 2008, he submitted an informal written request to Warden McGill regarding the conduct of Officers Hartley and Williams. Doc. 37, p. 10 (¶ 18-19). Despite his allegations, Young provides no evidence of this written request.  Young further claims that when he did not receive a response to his alleged informal request, he sent "Inmate Administrative Remedy Forms" to Warden McGill, asserting grievances about alleged deliberate indifference to his mental health needs by Officers Williams and Hartley.  These grievance forms were attached to Young's original Complaint and submitted by defendants in support of their present summary judgment motion.  *See* Doc. #1-1, p. 17-18 (Ex. F, G, G-1).

Warden McGill denied Young's grievances regarding "staff conduct" on October 27, 2008. Doc. 45-16, p. 3; Doc. 45-3, p. 26-27.  He explained that Young's "allegations of calling the bubble

26

officer cannot be verified." Doc. 45-16, p. 3. He also stated that "[t]he incident was reviewed" and concluded that "all staff involved [had] handled [the incident of September 3] in an appropriate manner in accordance with [Department of Correction Administrative] directive." *Id.* He informed Young that he could appeal this decision to District Administrator Choinski. *Id.*

In *McKenna v. Wright*, 386 F.3d 432, 437-38 (2d Cir. 2004), the Second Circuit noted that it was "questionable [ as to] whether an adjudicator's rejection of a grievance would make him liable for the conduct" of which the inmate complained. The Second Circuit concluded, however, that "[w]hen allegations of improperly denied medical treatment come to the attention of a supervisor of a medical program, his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility." 386 F.2d at 438 (citing *Colon*, 58 F3d at 873).

The district courts within this Circuit "are divided regarding whether review and denial of a grievance constitutes personal involvement in the underlying alleged unconstitutional act." *Burton v. Lynch*, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009) (collecting cases). For example, with respect to "personal involvement," a number of courts have drawn a distinction between "a pro forma denial of a grievance and a 'detailed and specific' response to a grievance's allegations." *Id.* (citing *Brooks v. Chappius*, 450 F.Supp.2d 220, 226 (W.D.N.Y. 2006).)[12] Put simply, denial of a grievance alone may be insufficient to establish the "personal involvement" of a supervisory official. *See, e.g.,*

---

[12]    In *Brooks*, the district court held that "[a] supervisory official's receipt of a letter complaining about unconstitutional conduct [was] not enough to give rise to personal involvement on the part of the official." 450 F.Supp.2d at 225. Morever, "[e]ven the fact that an official ignored a letter alleging unconstitutional conduct [was] not enough to establish personal involvement." *Id.* at 226 (citations and internal quotations omitted).

*Hatzfeld v. Eagen*, No. 9:08–CV–283 (LES/DRH), 2010 WL 5579883, at *5 (N.D.N.Y. Dec. 10, 2010) ("Merely denying a prisoner's grievance is insufficient to establish personal involvement") (citation and internal quotation marks omitted), *report and recommendation adopted*, No. 9:08CV283 (LES/DRH), 2011 WL 124535, at * 1 (N.D.N.Y. Jan. 14, 2011); *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 649 (W.D.N.Y. Jan.6, 2010) (where plaintiff alleged that defendant prison official investigated his  grievance but found no evidence of retaliation, the "mere fact that [defendant] concluded that plaintiff had not been retaliated against by other officers [did] not amount to a constitutional violation by [the defendant]"); *Warren v. Goord*, 476 F. Supp. 2d 407, 413 (S.D.N.Y. 2007) (dismissing claim against director of inmate grievance program where "plaintiff [did] not explain how a denial of a grievance violate[d] [his] constitutional or federal rights so as to state a claim under § 1983").

Similarly,  courts have held that a supervisory official's act of affirming the denial of a grievance on appeal does not constitute personal involvement.  *See, e.g., Joyner v. Greiner*, 195 F.Supp.2d 500, 506 (S.D.N.Y. 2002) ("The fact that [prison] Superintendent Greiner affirmed the denial of plaintiff's grievance [for deliberate indifference to his medical needs]—which is all that is alleged against him—[was] insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant")(citation and internal quotations omitted); *Manley v. Mazzuca*, No. 01CV5178 (KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) ("affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983") (citations omitted).

On the other hand, when a supervisory prison official receives a particular grievance,

personally reviews it, and responds and/or takes action in response, such conduct may constitute sufficient "personal involvement" to establish individual liability for the alleged constitutional violation. *See, e.g., Bourgoin v. Weir*, Civil No. 3:10cv391 (JBA), 2011 WL 4435695, at *5-6 (D. Conn. Sept. 23, 2011) (noting that a deputy warden "may be liable . . . for failure to remedy a wrong after being informed through a report or appeal, where he or she acts or responds in an inadequate fashion to a prisoner's letter of protest or request") (citation and internal quotations omitted).   See also *Lewis v. Wallace*, No. 9:11–CV–0867 (DNH/DEP), 2013 WL 1566557, at *5 (N.D.N.Y. Feb. 22, 2013) (recognizing that "courts in this circuit have held that personal involvement may be found where a supervisor receives, reviews, and responds to a plaintiff's grievance"), *report and recommendation adopted*, No. 9:11–CV–0867 (DNH/DEP), 2013 WL 1566555, at *1 (N.D.N.Y. Apr 12, 2013); *Cole v. N.Y.S. Dep't of Corr. Svcs.*, No. 9:10–CV–1098 (NAM/TWD), 2012 WL 4491825, at *22 (N.D.N.Y. Aug. 31, 2012) (supervisor's memoranda responding to plaintiff's complaints were sufficient to establish his personal involvement); *Harnett v. Barr*, 538 F.Supp.2d 511, 524 (N.D.N.Y. 2008) ("if the supervisory official acts personally in denying a grievance at various stages of the grievance process, he may be sufficiently involved in failing to remedy the situation") (citing cases); *Boddie v. Morgenthau*, 342 F.Supp.2d 193, 203 (S.D.N.Y. 2004) (holding that "[w]hile mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint").

Another factor district courts in this Circuit have examined is the nature of the alleged constitutional violation to determine whether it was "ongoing" or discrete in nature, and thus whether it could be remedied by the supervisor. *See, e.g, Burton* v. *Lynch*, 664 F. Supp. 2d 349,  360

(S.D.N.Y. 2009) ("an alleged constitutional violation complained of in a grievance must be 'ongoing' in order to find personal involvement, such that the 'supervisory official who reviews the grievance can remedy [it] directly.'") (quoting *Vega v. Artus*, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009)).[13] Following such reasoning, if the supervisory official is confronted with an "ongoing" constitutional violation and reviews a grievance or appeal regarding that violation, that official is "personally involved" if he or she can remedy the violation directly.  In contrast, "[i]f the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to remedy a violation." *Hartnett*, 538 F. Supp. 2d at 524.

In the case at bar, Warden McGill directly reviewed two grievances from Young, asserting complaints about the failure of Officers Hartley and Williams to respond to and arrange for treatment of Young's mental health needs on September 3, 2008.  McGill denied those grievances after reviewing the incident and concluding that "all staff involved [had] handled [the incident] in an appropriate manner in accordance with [DOC] directive."  Doc. 45-16, p. 3.   Pursuant to the common law of this Circuit, mere denial of a grievance may be insufficient to establish the "personal involvement" of a supervisory official.  *See, e.g.*, *Joyner*, 195 F.Supp.2d at 506; ;  *Rosales*, 677 F. Supp. 2d at 649.

Nonetheless, if McGill failed to respond adequately upon receiving notice of a violation that could be remedied, *Bourgoin*, 2011 WL 4435695, at *5-6,  such as an "ongoing" violation, *Burton*,

---

[13]  In *Burton*, the district court concluded that there was no personal involvement by the superintendent of the correctional facility because the situation which had given rise to the grievance was no longer "ongoing," the request for relief had been satisfied, and the plaintiff had been transferred to another facility before defendant superintendent received plaintiff's appeal. 664 F. Supp. 2d at 361-62.

664 F. Supp. 2d at 360, he may be held liable.  In the absence of an ongoing violation – one that is capable of mitigation –  McGill cannot be held personally liable.  "Requiring an ongoing constitutional violation which is capable of mitigation at the time the supervisory official was apprised thereof, ensures that a Superintendent is not held liable for every constitutional tort committed by a subordinate solely by virtue of his role as the intermediate appellate level in the inmate grievance process."  *Burton*, 664 F.Supp. 2d at 361.

In the case in suit, the grievances Young submitted to McGill solely included complaints about misconduct that had already occurred and concluded, as opposed to "ongoing" violations. Therefore, with respect to plaintiff's allegations regarding his treatment by Williams and Hartley, that conduct could no longer be effectively remedied.  Accordingly, Young has failed to allege McGill's "personal involvement" in the alleged deliberate indifference to Young's serious mental health needs on September 3, 2008.  The motion for summary judgment will be granted as to claims of deliberate indifference to mental health needs against defendant McGill in his individual capacity.[14]

## D.    <u>Supervisor Liability – Official Capacity</u>

The Court notes that plaintiff seeks declaratory and injunctive relief from the defendants in their official capacities.  The requirement of pleading each defendant's personal responsibility does not apply to such requests for equitable relief.  *Cf. Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("personal involvement of defendants is a prerequisite to an award of *damages*," as opposed to equitable relief).  Instead, it is sufficient if the plaintiff names an appropriate supervisory defendant

---

[14]   The Court notes that Young has also failed to demonstrate an affirmative link between McGill's denial of his grievances and Young's alleged injuries in this action.  *See, e.g., Poe*, 282 F.3d at 123.

in his official capacity for purposes of imposing appropriate equitable relief.  The defendants' motion for summary judgment does not address this aspect of Young's claim of deliberate indifference to his mental health needs.  Accordingly, summary judgment will be denied with respect to plaintiff's claims for injunctive and declaratory relief pertaining to the claim of deliberate indifference to mental health needs against all defendants in their official capacities.[15]   That denial is without prejudice to a further motion for summary judgment addressing those claims, if defendants are advised to make it.[16]

## IV.  CONCLUSION

Defendants' Motion for Summary Judgment [Doc. 45] is GRANTED with respect to the claims of deliberate indifference to medical needs as to all defendants and with respect to the claims of deliberate indifference to mental health needs against defendants Salius, Rose, Light, McGill and Choinski in their individual capacities.  The Motion for Summary Judgment [Doc. 45] is DENIED with respect to the claims of deliberate indifference to mental health needs against defendants Hartley and Williams in their individual and official capacities.  Accordingly, the remaining claims in this action include:  (1) the claims against defendants Hartley and Williams in their individual and official capacities for deliberate indifference to mental health needs; and (2) the requests for declaratory and injunctive relief pertaining to the claim of deliberate indifference to mental health

---

[15]   The Court notes that  the Second Circuit has held that  "state officials cannot be sued in their official capacities for retrospective relief under section 1983.  Nonetheless, state officials can be subject to suit in their official capacities for injunctive or other *prospective* relief."  *Huminski v. Corsones*, 396 F.3d 53, 70 (2d Cir. 2005) (emphasis added) (citations omitted).

[16]   Because the deadline to file dispositive motions has expired, any proposed motion for summary judgment must be preceded by, or filed contemporaneously with, a motion to reopen that deadline, demonstrating "good cause" for said extension.

needs against defendants Salius, Rose, Light, McGill and Choinski in their official capacities.

It is SO ORDERED.

Dated: New Haven, Connecticut
        March 13, 2014


                                    _/s/Charles S. Haight, Jr._____
                                    CHARLES S. HAIGHT, JR.
                                    Senior United States District Judge